PEOPLE *v.* HOWARD.

1. CRIMINAL LAW—EVIDENCE—ASSAULT WITH INTENT TO KILL—TITLE OF PROPERTY IN DISPUTE.

Upon the trial of a prosecution for assault with intent to kill, evidence offered by respondent to show that he owned certain hay, which had been the subject of dispute between him and the complaining witness, was properly excluded, although the fact of the dispute and its origin was admissible and was shown by the testimony.

2. SAME—ASSAULT AND BATTERY—INTENT.

In order to constitute assault with intent to kill and murder, an intent to do serious injury must be established and it must be shown that the accused intended to do such serious or permanent bodily harm as the means he employed and manner of using them would naturally effect; but he need not have contemplated the exact result which he in fact caused.

3. SAME—HOMICIDE, ATTEMPTED.
   Where the accused claimed that he shot at the complaining witness to frighten him and did not intend to hit him, aiming low, with the purpose of frightening him, also that he was acting in defense of his property rights in certain hay which the witness had carried away, the court should not have instructed the jury that the respondent was guilty of either assault with intent to murder or assault with intent to do great bodily harm, but should have given a request to charge that the jury might find respondent guilty of the offenses named or of assault and battery, or find him not guilty. McALVAY, C. J., and KUHN, J., dissenting.

4. SAME—TRIAL—MISCONDUCT—ARGUMENT.
   It is the duty of counsel for respondent to accept and acquiesce in the rulings and instructions of the trial court; it was improper to argue to the jury that they might decline to follow the instructions of the circuit judge: the remedy is by exception to the ruling.

Exceptions before sentence from Van Buren; Bridgman, J. Submitted November 7, 1913. (Docket No. 166.) Decided March 27, 1914.

John L. Howard was convicted of assault with intent to do great bodily harm less than murder. Reversed.

*Grant Fellows*, Attorney General, *Earl L. Burhans*, Prosecuting Attorney, and *Lynn J. Lewis*, Assistant Prosecuting Attorney, for the people.

*W. J. Barnard*, for respondent.

MOORE, J. An information was filed against respondent. In the first count he is charged with making an assault with intent to kill and murder. The second count charged:

"On the said 22d day of June, A. D. 1912, at the township of Bloomingdale, in the county aforesaid, he, the said John Howard, with force and arms, in and upon the said M. F. Burgett, in the peace of the people

of the State of Michigan then and there being, did then and there make an assault, and him, the said M. F. Burgett, then and there did beat, bruise, wound, and ill treat, with intent then and there to do unto him the said M. F. Burgett, great bodily injury less than the crime of murder."

The respondent was convicted of the offense charged in the second count. The case is here upon exceptions before sentence.

The assignments of error are discussed by counsel for respondent under. eleven heads. We think it sufficient for the purpose of this case to consider: *First*, whether there was error in admitting certain testimony and excluding other testimony; and, *second*, did the court err in refusing to give certain requests to charge preferred by respondent, and in charging the jury as he did.

1. Without setting out the evidence in detail, it is apparent from the record the court attempted, and we think succeeded, in admitting all the testimony germane to the issue. He allowed it to be shown what was said and done in the hay field just prior to the shooting, and what was said and done at the time of the shooting, and also allowed a full examination as to what the complaining witness had testified before the examining magistrate. He permitted it to be shown that there was a dispute as to the ownership of the hay, but declined to go into the question of allowing the ownership to be decided in this litigation. We do not think there was any reversible error in relation to the admission or rejection of testimony.

2. Was there error in refusing certain requests to charge and in the charge as given? It now becomes necessary to state briefly the salient facts disclosed by the record. As before stated, there was a dispute between the complaining witness and respondent as to the ownership of hay which was in bunches in a field about eight rods north and in sight of respond-

ent's house. The complaining witness and his men were loading the hay, when the wife of respondent came to the field and ordered them to desist, and sat upon some of the bunches of the hay. The complaining witness paid no attention to her and continued to load the hay. The respondent saw what occurred and, taking a loaded shotgun, started down the highway toward the field, declaring he would shoot the man, calling him all sorts of names. He was persuaded by some of the neighbors to desist from carrying out his threats and returned to his house. After the hay was loaded, the men drove the team and wagon with the hay past the respondent's house. The complaining witness stopped at a store for some purpose, and after a little delay started to go on home, keeping the opposite side of the highway from the house of the respondent. When he got nearly opposite the house, respondent called him vile names. At this point there is some dispute as to what occurred. At this time the load of hay had passed out of sight. Respondent either went into his house or reached in and got his shotgun and pointed it at complaining witness and attempted to discharge it. It failed to discharge. He again made the attempt, and the second time it went off and lodged a quantity of shot in the legs, thighs, and one of the arms of the complaining witness.

There was plenty of testimony offered on the part of the people, if believed, to justify a verdict under either count of the information. The respondent was sworn. Among other things, he testified:

"I saw Mr. Burgett up in the hay field, and I directed my wife and Mr. Moore to go up there, and while they were in the hay field I was sitting up on the west side on the porch. I could see what was taking place in the hay field. I saw them loading hay, and I saw, after my wife got up there on the hay. I seen them pitch hay regardless of her; didn't seem to

notice her.  *  *  *  About that time my wife came back from the hay field and came in the house. She told me what had occurred in the hay field. After that I saw Mr. Burgett. It was not very long until he came by, or the hay came by. He came over towards me, and he got pretty near me. I says, 'Burgett, I want you to bring back my hay.' I jumped up or got up and went into the house and got the shotgun. I have heard these witnesses testify that I did not go inside of the door; I say I did. I got the gun from the south side of the incubator. I went out with it. I shot at Burgett in that direction. I aimed it low.

"*Q.* What was your purpose in shooting at him?

"*A.* I wanted to scare him from coming back and getting any more hay. I wanted to get it settled some way, if I could, and stop him from coming because I had no other way.

"*Q.* Did you have any intentions to hit him?

"*A.* No, sir; I didn't expect to hit him. I expected to shoot close and scare him, make him think I would hurt him. *  *  *  Mr. Burgett pointed a gun at me that day; yes, sir.

"*Q.* You may state whether or not he made any effort to draw any gun before you shot?

"*A.* Well, sir; he came along up there. When he waved his hand, he had his hand up there (illustrating.) Could you see this—that is the place where he carried his gun.

"*Q.* Had you seen him with this gun on him?

"*A.* I had.

"*Q.* Could you tell that he had that gun in the holster from where you stood?

"*A.* I thought he had. When he came up there that day he was coming across, crossing the road to come across. There is a path along by the hotel that leads down to the schoolhouse, an old path rather abandoned. Coming across he came over in the direction where the path had been. I cussed him. I think I was mad; I couldn't have been any madder. I think I called him everything I could think of. After I shot him, I told him to shoot; that he was a coward and afraid to shoot, and a son of a bitch and everything else. I talked as loud as I can. When I get excited I talk loud. I can't hardly walk at all. I am a cripple

in the right leg. When I went towards the black-
smith shop, I had the gun and my cane. Before I
shot him, I think I called him a thieving son of a bitch.
Burgett kept muttering to me saying things I could
not understand.    *    *    *

"Q. Did you have any intent of hitting Mr. Burgett
with any of those shot at the time you aimed that gun?

"A. No, sir.

"Q. Did you have any intent to inflict any severe
injury on him?

"A. I did not.

"Q. You shot simply to scare him?

"A. I did."

Upon the cross-examination he testified, among
other things, as follows:

"I was looking down that way and saw him come
along. After he came out of the shop, he came on
south, west side of the road and the side opposite my
property. When he addressed me, he came about
parallel across from the greenhouse. He came across
the road across the track, right to the edge of the
track where the stone was. He came on the east side
of the beaten part of the road. He was on the east
side of the worn part of the highway. I don't remem-
ber just the words I called him, but I done my best.

"Q. Did you notice several witnesses around there?

"A. There was something like a circus day. They
was all out on the parade. I didn't consider it a circus.
It was a pretty serious affair with me, a man taking
my bread and butter, and I had nothing to live on.
*    *    *    When I saw Burgett, he was standing in
that position (illustrating) looking back towards me.

"Q. Trying to get his gun out?

"A. He was making work with his hand in there.

"Q. You could see him reaching and pulling, could
you?

"A. I saw him doing something of that kind and
took it he was getting out his gun.

"Q. At that moment you fired your shotgun?

"A. I did, sir. I shot the gun, as I said before, to
scare him, keep him from going any farther. I saw
him at the time he reached for his gun. It occurred
to me he was reaching for his gun. He carried a gun
all the time.

"*Q.* You concluded it was about time for you to use your gun if you were going to use it?

"*A.* Get my bluff in if I could.

"*Q.* And you claim this act of shooting was an act done in self-defense, don't you?

"*A.* Yes, sir.

"*Q.* Well, just before you raised your gun, you saw Mr. Burgett making an effort to get something out from under his wamus?

"*A.* Yes, sir.

"*Q.* And you have told us that it occurred to you at that time that he was making some effort to remove a gun from his person?

"*A.* Yes, sir. I knew he carried a gun on his person. At the time I shot, I didn't think I was in any danger. I thought he was reaching for his gun; he was going to play a bluff. I didn't think he was game enough to shoot.

"*Q.* Did you think you were game enough to shoot yourself?

"*A.* I did.

"*Q.* Didn't you claim at that time you shot in defense of your person?

"*A.* I said I shot in defense of my property and what belonged to me, because it was mine. I didn't include my person. I didn't care anything about that. * * * I brought the gun out again after I shot Burgett, and it was after I called him a black-hearted son of a bitch. I saw Summy go by on the load of hay. The hay was out of my sight at the time I shot; I don't think I could see it. I said to Burgett, 'I want you to bring back my hay.' It was going around the corner. I waited to see the hay start west to see if he wasn't going to bring it to me. I saw it wasn't going near my barn. * * *

"*Q.* You were collected enough at the time you shot to realize and intended to shoot low?

"*A.* Yes, sir. I did shoot low. If I had wanted to hit him in the head, I would have shot higher.

"*Q.* You shot at Mr. Burgett and accidentally hit him, according to your theory?

"*A.* I shot back, aimed about his ankles or feet so as to give him a scare that I would shoot if he had kept pushing me. I aimed at his ankles. I shot low,

yes, sir; about the height of his feet or legs or knees.

"*Q.* If you aimed it at the height of his feet or legs, that shot would hit that portion of his body?

"*A.* I don't know where the shot would go.

"*Q.* I am asking you this question. You say you aimed the gun at his legs and feet. Now, if it was aimed at his legs or feet it would hit that portion of his body, wouldn't it?

"*A.* Down along here (indicating). I aimed the gun low.

"*Q.* And some of the shot hit where you aimed, isn't that true?

"*A.* Yes, I guess so. I ain't seen him and don't know whether I hit him or not; just got his word for it, and that don't amount to nothing.

"*Q.* You didn't care, did you?

"*A.* Care for what? I aimed to hit him, and that shows what I intended to do."

One of the witnesses for the people testified:

"When I first seen Mr. Howard, he came out with the gun in his hand and rested it on the porch, and he was not back in the house until after the shot was fired; I don't think he was.

"*Q.* If he came (Burgett) over towards the cinder path, he had to come over on Howard's side of the road?

"*A.* Yes. When Mr. Howard came out with the shotgun, he was quite angry, quite excited, and that condition kept up until the shot was fired. When the gun popped the dust flew; I saw the dust fly from the force of the shot striking the ground. I saw the dust fly right behind Burgett. In justice's court I testified I saw the dust fly after the shot was fired. Possibly some of the shot went into the dirt. The dust flew right behind Burgett, as though part of the charge had taken effect in the ground; yes, sir."

The twenty-fourth request to charge was refused. It was very long and dealt with the question of intent as applicable to each count of the information and contained some statements it would not have been proper to give. There was no instruction given by the judge upon the subject of intent as applicable to

the second count, except in that portion of the general charge to which we will refer later.

Three of the requests to charge deal with the sub-- ject of assault and battery. The last one reads:

"You may return any one of these four verdicts as you find the facts to be from the evidence in the case, that is: *First*. Assault with intent to murder. *Second*. An assault with an intent to do great bodily harm. *Third*. Assault and battery. *Fourth*. Not guilty."

Instead of giving any of these written requests, the trial judge charged in part as follows:

"In all criminal cases the defendant is presumed to be innocent. The legal presumption of innocence is not a mere form to be disregarded by you, but it is a substantive part of the law and continues with the defendant until you are satisfied of the guilt of the defendant beyond all reasonable doubt. The defendant is not required to prove his innocence, but the people must establish the guilt of the respondent beyond every reasonable doubt. And this applies in all criminal cases to every material fact connected with such case. And if, after all the evidence is before you, you still have a reasonable doubt of the guilt of the respondent, it will be your duty to acquit him. * * * Under the evidence in this case, and the testimony of respondent himself in his own words that 'I aimed to hit him and that shows what I intended to do,' the only important question for you to determine is whether the respondent is guilty of the greater crime of assault with intent to commit the crime of murder, or of the lesser offense of an assault with intent to do great bodily harm less than the crime of murder; and your verdict should be one or the other of those offenses. * * * But, gentlemen, in an assault with intent to do great bodily harm, it is not necessary, if the party had died, that the one making the assault would have been guilty of murder; neither is it necessary, in such offense, that a permanent injury follow such assault. If a person assault another with a dangerous weapon (and the gun that has been exhibited here is a dangerous weapon), he is guilty

of assault with intent to do great bodily harm. That is, if a man wilfully and intentionally fires a gun, loaded with shot, at another under the facts shown in this case, and admitted by respondent, he is guilty of assault with intent to do great bodily harm; and he would be guilty even if he had not hit Burgett with the shot."

In *People* v. *Griffin*, 77 Mich. 585 (43 N. W. 1061), the respondent was a witness in his own behalf. The court said:

"The felonious intent was a question of fact for the jury, to be inferred by them from all the facts and circumstances disclosed by the testimony."

Referring to the testimony of the respondent, it was said:

"The whole statement must be received; but the credit due to it, and to each part of it, must be determined by the jury, who may believe one portion of it and disbelieve another. They may give it such credit as they deem it worthy of."

See *People* v. *Gordon*, 100 Mich. 518 (59 N. W. 322).

In *People* v. *Miller*, 91 Mich. 639 (52 N. W. 65), it was said:

"The court correctly instructed the jury that the result of the blow or kick should not be used as evidence to show the intent with which such blow or kick was given, unless they found, beyond a reasonable doubt, that such result was contemplated by Miller when he made the assault."

The following was characterized as a fair charge:

"With reference to this subject I charge you that, to constitute the offense charged in the information, the defendant must have intended to do Mr. Dickinson great bodily harm—serious and permanent bodily injury—and he must have intended to do such serious and permanent bodily injury as was within the natural result of the means he employed, and his manner of using those means. But he need not have con-

templated with mathematical precision or intended to do only the precise thing which actually followed his assault; as, if one rib was broken, and that the eleventh, he need not necessarily have intended to break the eleventh rib  *  *  *  and the injury to the kidney, but he must have had in contemplation an injury of that general character, and an injury serious and permanent; otherwise he could not be said to have intended to have done great bodily harm, as is charged in this case."

See *People* v. *Ross*, 66 Mich. 94 (33 N. W. 30).

In *People* v. *Troy*, 96 Mich. 530 (56 N. W. 104), Justice Long, speaking for the court, said:

"We see no difficulty about the definition to be given to the offense. The Iowa court in *Cokely* v. *State* [4 Iowa, 479], *supra,* found no difficulty in defining it, or in holding that the case under consideration came within the statute. It is the intent with which the injury is inflicted that aggravates the assault, and brings it within the statutory definition of an assault with intent to do great bodily harm. It must be an intent to do a serious injury, of an aggravated nature. The trial courts seem heretofore to have had no difficulty in defining the offense, or in making a jury comprehend when a case falls within the statutory definition."

In *People* v. *Ellsworth*, 90 Mich. 442 (51 N. W. 531), it is said:

"It is claimed that under the ruling of this court in *Turner* v. *Circuit Judge*, 88 Mich. 359 [50 N. W. 310], assault and battery is not included within the statutory crime of assault with intent to do great bodily harm less than the crime of murder; and that the information was bad because it joined a felony with a misdemeanor, and charged two distinct offenses in one count. But this case is ruled by *Hanna* v. *People*, 19 Mich. 316. It was there held that:

" 'Assaults, with various degrees of aggravation, must include the inferior degree of simple assault, or, if the higher degree is charged, *including a battery*, as in the present case, the simple assault and battery are included, and that the defendant may be convicted of the included offense.'

"In *Turner* v. *Circuit Judge*, there was no battery charged, and we held that the information could not be amended to include a battery after verdict. It was not intended to hold that a person tried for assault with intent to do great bodily harm, less than the crime of murder, could not be convicted of assault and battery, if such assault and battery were properly alleged in the information.

"In the case before us the information is not as · clear and precise as it might have been, but it evidently was intended to charge an assault and wounding and beating with intent to do great bodily harm, less than the crime of murder. No injustice is done the respondents, in treating the allegation of beating and wounding as if the information had charged as follows:

" 'With force and arms, in and upon Edward Patnode and Frank Jewell, in the peace of the people of the State of Michigan then and there being, did make an assault, and the said Edward Patnode and Frank Jewell did then and there beat, bruise, wound, and ill treat, with intent to do them, the said Edward Patnode and Frank Jewell, great bodily harm, less than the crime of murder.'

"Thus stated, the information would not have been open to objection, and a conviction of assault and battery could have been had under it. *Hanna* v. *People*, 19 Mich. 322; *State* v. *McAvoy*, 73 Iowa, 557 (35 N. W. 630); *State* v. *Welsh*, 73 Iowa, 106 (34 N. W. 765). We consider the information as one charging an assault and beating and wounding with intent to commit the greater crime therein alleged."

In *People* v. *Neumann*, 85 Mich. 98 (48 N. W. 291), it is said:

"Whenever there is no question of intent in a criminal case, and no inferences, about which reasonable men might differ, to be drawn from the facts, and where, upon the admitted facts, the only question to be determined is whether under the law the statute has been violated, the trial judge may, with perfect propriety, state to the jury that the law applied to the facts, which are undisputed, shows the defendant to be guilty of the offense charged, and that it is their duty so to find under the facts and the law. But it

has been repeatedly held that he cannot in so many words direct them that they must bring in a verdict of guilty; and that they are at liberty to find otherwise, if they see fit, under the Federal Constitution, which guarantees to every accused person 'the right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed.'

"And verdicts have often been set aside when directed by courts in opposition to this right. See *United States* v. *Taylor,* 11 Fed. 470, and cases there cited. But in this State, where a judge has directed a verdict of guilty, and the jury have followed such direction, and the facts are admitted or undisputed, and the only question is one of law, applied to such facts, a new trial will not be granted, if the judge was right in his application of the law. No injustice can be done the accused in such case, as it is not to be presumed that a jury will find in opposition to the law from mere whim, caprice, or prejudice, although they may have the right to do so.

"In this ruling we do not intend to encourage the practice of directing a verdict against the accused in criminal cases. In all such cases the jury should be permitted to retire to the jury room, and there deliberate, and the trial judge should content himself by stating the law as applied to the facts, and with an admonition to the jury of their plain duty in the premises."

We think the court erred in directing, as a matter of law, that the jury must either convict him of assault with intent to murder, or assault with intent to do great bodily harm. We think the last request of respondent should have been given.

The argument made by the attorney for respondent, and which in his brief he attempts to defend, asked the jury to disregard the instructions of the circuit court. The argument was unprofessional and outrageous and merited immediate discipline at the hands of the trial court.

It is the duty of the jury to follow the direction of the court as to the law of the case, and it is the duty

of counsel to acquiesce during the trial in the rulings and instructions of the court. By exceptions to what occurs the rights of his client can be protected.

For the reason stated, the verdict must be set aside, and a new trial granted.

BROOKE, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred with MOORE, J.

MCALVAY, C. J. Under the facts in this case, I am of the opinion that it should be affirmed.

KUHN, J., concurred with MCALVAY, C. J.